# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

DOROTHY M. HOLCOMBE,      :

     Plaintiff,             :

vs.                       :      CA 16-0566-MU

NANCY A. BERRYHILL,      :
Acting Commissioner of Social Security,
                         :

     Defendant.

## MEMORANDUM OPINION AND ORDER

Plaintiff brings this action, pursuant to 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security denying her claim for a period of disability and disability insurance benefits. The parties have consented to the exercise of jurisdiction by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c), for all proceedings in this Court. (Docs. 18 & 20 ("In accordance with provisions of 28 U.S.C. §636(c) and Fed.R.Civ.P. 73, the parties in this case consent to have a United States magistrate judge conduct any and all proceedings in this case, . . . order the entry of a final judgment, and conduct all post-judgment proceedings.")). Upon consideration of the administrative record, Plaintiff's brief, and the Commissioner's brief,[1] it is determined that the Commissioner's decision denying benefits should be affirmed.[2]

---

[1]      The parties waived oral argument. (*Compare* Doc. 17 *with* Doc. 19.)

[2]      Any appeal taken from this memorandum opinion and order and judgment shall be made to the Eleventh Circuit Court of Appeals. (*See* Docs. 18 & 20 ("An appeal from a judgment entered by a magistrate judge shall be taken directly to the United States court of (Continued)

## I. Procedural Background

Plaintiff initially filed an application for a period of disability and disability insurance benefits on April 18, 2011, alleging disability beginning on January 1, 2007. (*See* Tr. 144-47.) Her claim was initially denied on June 20, 2011 (*see* Tr. 57-63) and, following Plaintiff's written request, an Administrative Law Judge ("ALJ") (*see* Tr. 66-67), conducted a hearing on June 24, 2013. (Tr. 30-43). This hearing took place after a consultative examination by Dr. Huey Kidd. (*Compare* Tr. 44-47 (discussion at administrative hearing on September 5, 2012 of the need for a consultative examination) *with* Tr. 250-57 (consultative examination by Dr. Huey Kidd)). On July 11, 2013, the ALJ issued a decision finding that the claimant was not disabled and, therefore, not entitled to disability insurance benefits (Tr. 20-26); the Appeals Council denied Holcombe's request for review on November 28, 2014. (Tr. 2-4).

Following an appeal to this Court, *see Holcombe v. Colvin,* Civil Action No. 15-0028-KD-M, Doc. 1, the government filed a sentence four motion to remand, *see id.* at Doc. 14; the government's motion was granted and this action was remanded to the Commissioner of Social Security for further administrative proceedings, *see id.* at Docs. 15-16. Pursuant to the Court's order and judgment, the Appeals Council entered a remand order on September 8, 2015 (*see* Tr. 354-58), suggesting that the ALJ obtain the opinion of a medical expert, "if necessary," in order to "clarify the nature and severity of the claimant's impairments through December 31, 2011, the claimant's date last insured[.]" (Tr. 357.) Upon remand, the ALJ conducted an initial hearing on January 7,

appeals for this judicial circuit in the same manner as an appeal from any other judgment of this district court."))

2016 (Tr. 296-305) and a supplemental hearing on June 28, 2016 (Tr. 289-95).[3] On July 19, 2016, the ALJ issued a decision finding that, through the date last insured, Holcombe retained the residual functional capacity to perform a limited range of medium work and, therefore, was capable of performing her past relevant work as an inventory clerk, home health attendant, and sewing machine operator or, alternatively, was capable of performing other jobs existing in substantial numbers in the national economy. (*See generally* Tr. 272-83). Because the ALJ's decision of July 19, 2016 followed a court-ordered remand, the ALJ's decision became final on the sixty-first day following the ALJ's unfavorable decision, absent review by the Appeals Council. (*See* Tr. 270 ("If you do not file written exceptions and the Appeals Council does not review [the ALJ's] decision on its own, [the ALJ's July 19, 2016] decision will become final on the 61st day following the date of this notice. After [the ALJ's] decision becomes final, you will have 60 days to file a new civil action in Federal district court.")). Because the Appeals Council did not review the ALJ's decision (*see generally* Doc. 13, Administrative Transcript), the hearing decision because the final decision of the Commissioner of Social Security.

Plaintiff alleges disability due mild degenerative disc disease, mild thoracic arthritis, chondrolysis of the right hip, and lumbar spondylosis at L4-5. The ALJ's decision denying benefits reads, in relevant part, as follows:

> **1.     The claimant last met the insured status requirements of the Social Security Act on December 31, 2011.**
>
> **2.     The claimant did not engage in substantial gainful activity during the period from her alleged onset date of January 1, 2007**

---

[3]     During those hearings, Plaintiff amended her disability onset date to her date last insured of December 31, 2011. (*See* Tr. 292 & 298.)

**through her date last insured of December 31, 2011 (20 CFR 404.1571 *et seq.*)**

The claimant worked after the alleged disability onset date but this work activity did not rise to the level of substantial gainful activity. The claimant performed self-employment in 2013 and 2014, after the date last insured. The claimant testified that she drove her aunt, who lived next door, back and forth to the doctor. She testified that she sometimes took food to [her] aunt. The claimant testified that this involved driving two to three times per month and intermittent food preparation. The claimant denied ever working full-time for her aunt. Her earnings indicated on the tax return were not the result of substantial gainful activity. The claimant did not perform work activity for pay or profit. The earnings are not indicative of substantial gainful activity.

**3.     Through the date last insured, the claimant had the following severe impairments: mild degenerative disc disease, mild thoracic arthritis, chondrolysis of the right hip, and lumbar spondylosis at L4-5 (20 CFR 404.1520(c)).**

.     .     .

**4.     Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).**

.     .     .

**5.     After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) except the claimant can occasionally climb ramps or stairs; never climb ladders, ropes, or scaffolds;  and occasionally balance, stoop, kneel, crouch or crawl.**

In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSR 96-4p. The undersigned has also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)—i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques—that could reasonably be expected to produce the claimant's pain or other symptoms.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functioning. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities.

The claimant alleges that she cannot work due to impairments related to "thyroid problems, sinus, hay fever (sic), and back." The claimant alleges that she can "hardly move my back" in the mornings. She stated that she is "dizzy a lot." She stated that she does prepare simple meals and wash clothes. The claimant reported that she has difficulty getting up and down into the tub; however, she stated that she can take a shower and perform personal care with "no problem." The claimant stated that she can drive and go out alone. She reported that she can shop once per week for several hours. The claimant reported that she can read the [B]ible and sew[.] She stated that she attends church two Sundays during the month. She stated that she can pay attention for as long as needed, can follow written instructions well, can follow spoken instructions adequately, and can deal with authority figures adequately. The claimant did state that she does not handle stress or changes in routine well. She stated that she can lift only about ten pounds. Although she stated that she cannot squat, she stated that she can bend halfway down; therefore, her ability to stoop and complaints regarding squatting are somewhat inconsistent with the Dictionary of Occupational Titles descriptions of these activities. The claimant stated that she cannot walk more than five to ten minutes. She stated that she can reach for a few minutes. She reported other difficulty at nighttime, but there was no evidence of daytime manifestations of any sleep/nighttime problems. However, she stated that she also has problems because her "legs swell every day and [there is] pain constantly["].

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's

statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

In terms of the claimant's alleged back, hip, knee, and other physical impairment[s], the claimant's alleged limitations are not fully consistent with the evidence. The claimant did have a hip replacement procedure this year, in 2016. However, the level of treatment significantly changed recently. She has obtained treatment for multiple acute complaints over time, prior to the date last insured. However, the claimant's [hip] replacement brief treatment, surgery, and now recovery [are] documented primarily only in 2015 and 2016 although the surgical consultation has been in 2016. The claimant's treatment notes at Family Medical of Jackson indicate at several times during 2015 that the claimant [stated] she has back and hip pain. She was prescribed medications. However, there were extended periods without change in her medications. Her treatment was infrequent and conservative until only recently.

The claimant was sent to an examination in February 2016; however, again, that examination was only shortly before her surgery. Moreover, aside from the hip impairment, the claimant did complain of back pain; however, the claimant denied ever having obtained medications for that pain. She reported that she had used only anti-inflammatories for her hip. The claimant did have evidence of cervical[,] lumbar and thoracic degenerative disc disease; however, each of those w[as] considered mild by the examining physician. The right hip did show chondrolysis but the left hip was normal even now. The claimant's examination showed that she had an antalgic gait on the right side. She did have pain in the groin area with limited range of motion. However, there was no atrophy or weakness. She had normal reflexes and sensation, even in 2016. She had a normal examination with regard to the upper extremities. Likewise, the claimant "on questioning her specifically about her cervical and thoracic spine, [] said she has no issues."

The claimant did have an MRI of the hip that showed "worrisome" findings that indicated concern for metastatic disease; however, there was subsequent hip replacement and other treatment for the hip since that time. Ultimately, there was no evidence of a PET scan or other testing. Dr. Dempsey's examination was after this MRI was performed. However, the recent nature of this concern and the absence of any conclusive medical evidence even now clarifies that this finding was not present at the date last insured. The claimant also had an x-ray of her lumbar spine near that time. She has a February 2015 x-ray that did show grade I spondylolisthesis at L4-5 "without evidence of spondylosis;" however, the later x-rays with Dr. Dempsey did include findings of a similar nature in the lumbar spine. The evidence clarifies that, even now, the issue is the lower

back and hip. The limited severity for the mid and upper back is clear by the substantially normal findings.

However, particular care was provided to the functional limitations due to the hip and lower back impairment that were present at the date last insured, if any. The claimant had treatment even in 2015 with Mobic, Naprosyn, Medrol dose pack, and Celebrex at different times. Therefore, the claimant did have changes in medication; however, those changes were long after the date last insured. The examination findings in December 2014 actually described the musculoskeletal findings as "normal." Her mood was euthymic, and there was no indication of an abnormal mood to indicate evidence of pain. Likewise, the chief complaint was "aching all over" that was both intermittent and only moderate in severity.

The claimant also had an MRI at the Jackson Medical Center that showed only "mild degenerative changes" in the hips and sacroiliac joints. X-rays of the hip and lower back in 2013 and 2015 all indicated only mild findings. That, yet again, provides substantial support for the residual functional capacity assessment through the time of the date last insured. Even these mild findings occurred well after the date last insured.

The claimant was examined by Huey Kidd, D.O. in January 2013. That examination showed that she ambulated "without a limp." She was able to stand and squat without difficulty. She was able to bend to touch her toes, heel walk, toe walk, and exhibit full range of motion. The claimant had x-rays of the thoracic and lumbar spine at that time that were normal. The claimant had been taking over-the-counter Aleve and Ibuprofen. She did have moderate osteoarthritis of the knee but the tibia and fibula appeared normal. The claimant did report that her knees hurt, but she stated only that her "back, heels, arms, legs, hips, wrists, and knees" hurt. She did not provide any specific direction that her knee hurt in a manner corresponding to the x-ray. Nonetheless, the limitation to occasional kneeling, crouching, and crawling would address her knee pain. Dr. Kidd noted those limitations on his form. He found that the claimant could perform lifting and carrying required for medium work. He stated that the claimant did not require a cane, and he stated that the claimant could stand/walk eight hours in an eight-hour workday.

However, in contrast to her report of taking over-the-counter medications, the claimant was prescribed Tylenol #4 during an examination in August 2012. There was no indication that the claimant followed-up or continued treatment at the Franklin Health Center or any other free/reduced cost provider. In contrast, the claimant had only two examination[s] at all with Family Medical of Jackson. She had acute complaints that were not repeated during subsequent treatment. He April 2012 examination, the

last, was for a cold with no report of hip pain, back pain, or other impairments related to her degenerative conditions that even indicate requests for treatment at that time. Prior to the date last insured, the claimant had exceptionally infrequent treatment with no indication of clinical findings indicating that any physical impairment was contributing to ongoing limitations. The claimant had examinations that involved refills of thyroid medication without any substantial change in medications or documentation of abnormalities suggesting that there were symptoms not being treated. She only had treatment for acute issues and even those were treated conservatively. She reported a headache on one occasion. She reported dizziness on another, but there was no follow-up or recurrence of the symptoms on multiple occasions. Still, the degenerative nature of her conditions do suggest that she was limited to work at the medium exertional level, lifting [and] carrying fifty pounds occasionally and twenty[-]five pounds frequently. Her pain arising from the combination of impairments of the back, hip, and knee would cause pain that would limit the claimant as described in the residual functional capacity. Likewise, although nonsevere, her hypothyroidism has required medications for treatment. If her dizziness or headaches were a side effect of this medication, this preclusion of work at the heavy exertional level would adequately address that factor. There is no indication of any specific substantiation of that issue; however, the residual functional capacity would address even these limited issues.

As for the opinion evidence, there can be no weight provided to the opinions of Thomas Dempsey, M.D. on the form or in his narrative explanation in February 2016. Dr. Dempsey actually suggests that the claimant would be capable of sedentary work; however, these limitations are not consistent with the evidence at the time of the date last insured, four years earlier. Even the year before, the claimant had "mild diffuse tenderness of lumbar area of back. No abnormality of exam of right hip." In addition, there was only pain noted "on rotation of left hip." The claimant had "no motor or sensory deficit in either lower extremity." Likewise, on Dr. Dempsey's form, he noted that the claimant could push or pull continuously with the lower extremities. He stated that the claimant could ambulate without a walker, wheelchair, or two crutches" even at that time. The form he completed cannot be provided any significant weight.

Likewise, there can be no significant weight provided to any opinion provided by Dr. Dempsey or even the treating sources briefly before or after the claimant's surgery for the hip replacement. The remarks pertaining to weight bearing or other related factors during the recuperative period for the claimant are not consistent with the evidence years prior to this treatment at the claimant's date last insured.

However, some limited weight is given to the opinion of Huey R. Kidd, D.O. in January 2013. This examination still was performed more than a year after the date last insured; however, the claimant's degree of limitation at that time is more consistent with the evidence prior to the date last insured. The opinion of Dr. Kidd, even though it was well after the date last insured, must be given some weight in light of the degenerative nature of the claimant's impairments. Still, there is no support for the environmental limitations identified. The claimant's physical joint pain would not prevent exposure even to unprotected heights or moving mechanical parts as a result of her impairments. The form in Exhibit 6F provides no specific justification for the environmental limitations, and although no justification for the postural limitations was provided either, there is some degree of support for limitations associated with those activities. The degree of limitation identified is not fully supported, but there is no reason to suggest that greater postural activities could be performed. Therefore, those postural limitations are viewed in the light most favorable to the claimant to suggest that they were present at the date last insured. However, the standing and walking limitations cannot be viewed in that light. The form itself lends to some question regarding the interpretation of the claimant's ability to stand and/or walk. However, there is no indication that the form supports any limitation in standing and walking greater than six hours total in an eight-hour day. Dr. Kidd provided no indication that standing and walking is diminished by any physical impairment. He stated that the claimant can continuously push or pull with the lower extremities, and he stated that the claimant had no difficulty ambulating without a limp or squatting and standing. Dr. Kidd's form actually indicates that the claimant can stand/walk for eight hours total in an eight hour day. There is no support for even a required alternation among sitting and standing in the examination report or in the other evidence prior to that time.

In sum, the above residual functional capacity assessment is supported by the limited symptoms reported even to family physicians and other sources regarding her physical complaints, the mild and limited findings on diagnostic testing even years after the date last insured, the absence of medications used, the activities of daily living reported prior to the date last insured and even long after the date last insured, and the clinical signs throughout the medical evidence prior to the date last insured.

**6.     Through the date last insured, the claimant was capable of performing past relevant work as an inventory clerk and sewing machine operator. This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).**

In order for past work to be considered past relevant work, the claimant must have performed the job as substantial gainful activity, within the last fifteen years, and for long enough to learn the job. The claimant worked eight hours a day, five days a week earning $14.00 per hour at work in 2004-05 and seven hours a day three days a week earning $10.00 at work in 2005-07. However, the claimant reported much longer duration of this work in Exhibit 1E. The earnings record shows that the claimant did have substantial gainful activity for each of these periods. The vocational expert witness testified that the claimant's past relevant work [was] as a[n] inventory clerk, 222.387-026[,] and sewing machine operator, DOT Code 786.685-030. She testified that these jobs were classified as semiskilled and unskilled work at the medium or light exertional level.

In comparing the claimant's residual functional capacity with the physical and mental demands of this work, the undersigned finds that the claimant is able to perform it as actually and generally performed. The vocational expert witness testified that an individual of the claimant's age, education, work experience, and residual functional capacity could perform the claimant's past relevant work as home health attendant, inventory clerk, and sewing machine operator. Pursuant to SSR 00-4p, the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.

Although the claimant is capable of performing past relevant work, there are other jobs existing in the national economy that she is also able to perform. Therefore, the Administrative Law Judge makes the following alternative findings for step five of the sequential evaluation process.

The claimant was born on October 15, 1953 and was 58 years old, which is defined as an individual closely approaching advanced age, on the date last insured. The claimant subsequently changed age category to advanced age. The claimant has at least a high school education and is able to communicate in English. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled.

In the alternative, considering the claimant's age, education, work experience, and residual functional capacity, there were other jobs that existed in significant numbers in the national economy that the claimant also could have performed.

.     .     .

Through the date last insured, if the claimant had the residual functional capacity to perform the full range of medium work, a finding of "not disabled" would be directed by Medical-Vocational Rule 203.21 and Rule 203.14. However, the claimant's ability to perform all or substantially all of

the requirements of this level of work was impeded by additional limitations. To determine the extent to which these limitations erode the unskilled medium occupational base, through the date last insured, the Administrative Law Judge asked the vocational expert whether jobs existed in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors the individual would have been able to perform the requirements of representative occupations such as hand packer, DOT Code 920.587-018; assembler, DOT Code 806.684-010; and cook helper, DOT Code 317.687-010. She testified that there are 937,000 jobs as a hand packer; 997,000 jobs as an assembler; and 311,000 jobs as a cook helper in the national economy.

Pursuant to SSR 00-4p, the undersigned has determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.

Based on the testimony of the vocational expert, the undersigned concludes that, through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, the claimant was capable of making a successful adjustment to other work that existed in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of the above-cited rules.

**7.     The claimant was not under a disability, as defined in the Social Security Act, at any time from January 1, 2007, the alleged onset date, through December 31, 2011, the date last insured (20 CFR 404.1520(f)).**

(Tr. 274, 275, 276, 277-81 & 282 (most internal citations omitted)).

## II. Standard of Review and Claims on Appeal

In all Social Security cases, an ALJ utilizes a five-step sequential evaluation

to determine whether the claimant is disabled, which considers: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment; (3) if so, whether the severe impairment meets or equals an impairment in the Listing of Impairments in the regulations; (4) if not, whether the claimant has the RFC to perform her past relevant work; and (5) if not, whether, in light of the claimant's RFC, age, education and work experience, there are other jobs the claimant can perform.

*Watkins v. Commissioner of Soc. Sec.*, 457 Fed. Appx. 868, 870 (11th Cir. Feb. 9, 2012)[4] (per curiam) (citing 20 C.F.R. §§ 404.1520(a)(4), (c)-(f), 416.920(a)(4), (c)-(f); *Phillips v. Barnhart*, 357 F.3d 1232, 1237 (11th Cir. 2004)) (footnote omitted). The claimant bears the burden, at the fourth step, of proving that she is unable to perform her previous work. *Jones v. Bowen*, 810 F.2d 1001 (11th Cir. 1986). In evaluating whether the claimant has met this burden, the examiner must consider the following four factors: (1) objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain; and (4) the claimant's age, education and work history. *Id.* at 1005. Although "a claimant bears the burden of demonstrating an inability to return to her past relevant work, the [Commissioner of Social Security] has an obligation to develop a full and fair record." *Schnorr v. Bowen*, 816 F.2d 578, 581 (11th Cir. 1987) (citations omitted). If a plaintiff proves that she cannot do her past relevant work, it then becomes the Commissioner's burden—at the fifth step—to prove that the plaintiff is capable—given her age, education, and work history—of engaging in another kind of substantial gainful employment that exists in the national economy. *Phillips, supra,* 357 F.3d at 1237; *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999), *cert. denied,* 529 U.S. 1089, 120 S.Ct. 1723, 146 L.Ed.2d 644 (2000); *Sryock v. Heckler*, 764 F.2d 834, 836 (11th Cir. 1985).

The task for the Magistrate Judge is to determine whether the Commissioner's decision to deny claimant benefits, on the basis that she can perform her past relevant work as an inventory clerk, home health attendant, and sewing machine operator or, alternatively, those medium, unskilled jobs identified by the vocational expert at the

---

[4] "Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir.R. 36-2.

administrative hearing, is supported by substantial evidence. Substantial evidence is defined as more than a scintilla and means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). "In determining whether substantial evidence exists, we must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).[5] Courts are precluded, however, from "deciding the facts anew or re-weighing the evidence." *Davison v. Astrue*, 370 Fed. Appx. 995, 996 (11th Cir. Apr. 1, 2010) (per curiam) (citing *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005)). And, "'[e]ven if the evidence preponderates against the Commissioner's findings, [a court] must affirm if the decision reached is supported by substantial evidence.'" *Id.* (quoting *Crawford v. Commissioner of Social Security*, 363 F.3d 1155, 1158-1159 (11th Cir. 2004)).

On appeal to this Court, Holcombe argues that the Commissioner's decision to deny her benefits is in error (*i.e.,* not supported by substantial evidence) because the ALJ erred in finding that she has the residual functional capacity to perform work at the medium level of exertion. (Doc. 14, at 3 & 8.) "More specifically, the ALJ erred in rejecting the opinions of Dr. [Huey] Kidd that limited Mrs. Holcombe to only occasional exposure to unprotected heights and moving mechanical parts (Tr. 256), and also limited Mrs. Holcombe to standing for no more than four (4) hours per day, total, in an 8-hour workday, and walking for no more than four (4) hours per day, total, in an 8-hour

---

[5]     This Court's review of the Commissioner's application of legal principles, however, is plenary. *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

workday (Tr. 253); and erred in giving no weight to the opinion of Dr. [Thomas] Dempsey." (*Id.* at 8-9; *see also id.* at 9-18.)

The responsibility for making the residual functional capacity determination rests with the ALJ. *Compare* 20 C.F.R. § 404.1546(c) ("If your case is at the administrative law judge hearing level . . ., the administrative law judge . . . is responsible for assessing your residual functional capacity.") *with, e.g., Packer v. Commissioner, Social Security Admin.*, 542 Fed. Appx. 890, 891-892 (11th Cir. Oct. 29, 2013) (per curiam) ("An RFC determination is an assessment, based on all relevant evidence, of a claimant's remaining ability to do work despite her impairments. There is no rigid requirement that the ALJ specifically refer to every piece of evidence, so long as the ALJ's decision is not a broad rejection, i.e., where the ALJ does not provide enough reasoning for a reviewing court to conclude that the ALJ considered the claimant's medical condition as a whole." (internal citation omitted)). A plaintiff's RFC—which "includes physical abilities, such as sitting, standing or walking, and mental abilities, such as the ability to understand, remember and carry out instructions or to respond appropriately to supervision, co-workers and work pressure[]"—"is a[n] [] assessment of what the claimant can do in a work setting despite any mental, physical or environmental limitations caused by the claimant's impairments and related symptoms." *Watkins v. Commissioner of Social Security,* 457 Fed. Appx. 868, 870 n.5 (11th Cir. Feb. 9, 2012) (citing 20 C.F.R. §§ 404.1545(a)-(c), 416.945(a)-(c)); *see also* 20 C.F.R. § 404.1545(a)(3) (in assessing RFC, the Commissioner is required to consider "descriptions and observations of [the claimant's] limitations from [] impairments,

including limitations that result from [] symptoms, such as pain, provided by [the claimant] . . . .").

To find that an ALJ's RFC determination is supported by substantial evidence, it must be shown that the ALJ has "'provide[d] a sufficient rationale to link'" substantial record evidence "'to the legal conclusions reached.'" *Ricks v. Astrue*, 2012 WL 1020428, *9 (M.D. Fla. Mar. 27, 2012) (quoting *Russ v. Barnhart*, 363 F. Supp. 2d 1345, 1347 (M.D. Fla. 2005)); *compare id. with Packer v. Astrue*, 2013 WL 593497, *4 (S.D. Ala. Feb. 14, 2013) ("'[T]he ALJ must link the RFC assessment to specific evidence in the record bearing upon the claimant's ability to perform the physical, mental, sensory, and other requirements of work.'"), *aff'd,* 542 Fed. Appx. 890 (11th Cir. Oct. 29, 2013); *see also Hanna v. Astrue*, 395 Fed. Appx. 634, 636 (11th Cir. Sept. 9, 2010) (per curiam) ("The ALJ must state the grounds for his decision with clarity to enable us to conduct meaningful review. . . . Absent such explanation, it is unclear whether substantial evidence supported the ALJ's findings; and the decision does not provide a meaningful basis upon which we can review [a plaintiff's] case." (internal citation omitted)).[6] However, in order to find the ALJ's RFC assessment supported by

---

[6]     It is the ALJ's (or, in some cases, the Appeals Council's) responsibility, not the responsibility of the Commissioner's counsel on appeal to this Court, to "state with clarity" the grounds for an RFC determination. Stated differently, "linkage" may not be manufactured speculatively by the Commissioner—using "the record as a whole"—on appeal, but rather, must be clearly set forth in the Commissioner's decision. *See, e.g., Durham v. Astrue*, 2010 WL 3825617, *3 (M.D. Ala. Sept. 24, 2010) (rejecting the Commissioner's request to affirm an ALJ's decision because, according to the Commissioner, overall, the decision was "adequately explained and supported by substantial evidence in the record"; holding that affirming that decision would require that the court "ignor[e] what the law requires of the ALJ[; t]he court 'must reverse [the ALJ's decision] when the ALJ has failed to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted'" (quoting *Hanna*, 395 Fed. Appx. at 636 (internal quotation marks omitted))); *see also id.* at *3 n.4 ("In his brief, the Commissioner sets forth the evidence on which the ALJ **could have** relied . . . . There may very well be ample reason, supported by the record, for [the ALJ's ultimate conclusion]. (Continued)

substantial evidence, it is not necessary for the ALJ's assessment to be supported by the assessment of an examining or treating physician. *See, e.g., Packer, supra,* 2013 WL 593497, at *3 ("[N]umerous court have upheld ALJs' RFC determinations notwithstanding the absence of an assessment performed by an examining or treating physician."); *McMillian v. Astrue*, 2012 WL 1565624, *4 n.5 (S.D. Ala. May 1, 2012) (noting that decisions of this Court "in which a matter is remanded to the Commissioner because the ALJ's RFC determination was not supported by substantial and tangible evidence still accurately reflect the view of this Court, but not to the extent that such decisions are interpreted to require that substantial and tangible evidence must—in all cases—include an RFC or PCE from a physician" (internal punctuation altered and citation omitted)); *but cf. Coleman v. Barnhart,* 264 F.Supp.2d 1007 (S.D. Ala. 2003).

In this case, the Court finds that the ALJ linked his RFC assessment—that is, a reduced range of medium work—to specific evidence in the record bearing upon Holcombe's ability to perform the physical, mental, sensory and other requirements of work. (*Compare* Tr. 277 & 278-79 *with generally* Tr. 197-251, 259-60, 696-98, 701-19 & 736-44.) Before addressing the medical evidence in support of the ALJ's RFC assessment and Plaintiff's arguments regarding various limitations found by Drs. Kidd

---

However, because the ALJ did not state his reasons, the court cannot evaluate them for substantial evidentiary support. Here, the court does not hold that the ALJ's ultimate conclusion is unsupportable on the present record; the court holds only that the ALJ did not conduct the analysis that the law requires him to conduct." (emphasis in original)); *Patterson v. Bowen*, 839 F.2d 221, 225 n.1 (4th Cir. 1988) ("We must . . . affirm the ALJ's decision only upon the reasons he gave.").

and Dempsey,[7] however, it need be noted that "[m]edium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 404.1567(c) (2016). "A full range of medium work requires standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday in order to meet the requirements of frequent lifting or carrying objects weighing up to 25 pounds." SSR 83-10, 1982 WL 31251, *6 (1983).

Plaintiff argues that the ALJ erred in failing to include in his RFC assessment Dr. Kidd's noted environmental limitations, that is, the limitations with respect to only occasional exposure to unprotected heights and moving mechanical parts (*compare* Tr. 256 *with* Tr. 277 & 280). The ALJ found that there was no support for the environmental limitations because "[t]he claimant's physical joint pain would not prevent exposure even to unprotected heights or moving mechanical parts as a result of her impairments." (Tr. 280.) For her part, Plaintiff argues that the dizziness or headaches she has from the medications she takes for her hypothyroidism is not sufficiently addressed by limiting her to lifting only 50 pounds but is addressed by Dr. Kidd's noted environmental

---

[7]     Drs. Kidd and Dempsey are consultative examiners. (*See* Tr. 250 (Dr. Kidd's notation that "[t]his is a 59 year old black female who comes in for a disability exam."); Tr. 720 (reflecting payment to Dr. Dempsey by the Social Security Administration for his examination of Holcombe)). In general, of course, "the opinions of examining physicians are given more weight than those of non-examining physicians, treating physicians are given more weight than those of physicians who examine but do not treat, and the opinions of specialists are given more weight on issues within the area of expertise than those of non-specialists." *McNamee v. Social Security Administration,* 164 Fed.Appx. 919, 923 (11th Cir. Jan. 31, 2006). In assessing the medical evidence, "[t]he ALJ must state with particularity the weight given to different medical opinions and the reasons therefor[,]" *Romeo v. Commissioner of Social Security,* 2017 WL 1430964, *1 (11th Cir. Apr. 24, 2017) (citing *Winschel v. Commissioner of Social Security,* 631 F.3d 1176, 1179 (11th Cir. 2011)), and the ALJ's stated reasons must be legitimate and supported by the record, *see Tavarez v. Commissioner of Social Security,* 638 Fed.Appx. 841, 847 (11th Cir. Jan. 7, 2016) (finding that the "ALJ did not express a legitimate reason supported by the record for giving [the consulting physician's] assessment little weight.").

limitations. (Doc. 14, at 12). Initially, there is no evidence of record during the relevant time period indicating that Plaintiff had side effects from her hypothyroid medication that would result in the environmental limitations (that is, only occasional exposure to unprotected heights and moving mechanical parts) found by Dr. Kidd on January 10, 2013. (*Compare* Tr. 204-11 (plaintiff's treating physician, on February 11, 2010, noted her subjective belief that her Synthroid was causing bloating and gas, "even though she has taken Synthroid for years with no such side effects[,]" but gave no indication that Plaintiff's additional complaint of dizziness was linked to her Synthroid) *with, e.g.,* Tr. 236-44 (Holcombe remained on her same dosage of Synthroid in 2012 with no complaints of bloating, gas or dizziness); Tr. 250 (no complaints to Dr. Kidd of dizziness or other problems attributable to Synthroid) & Tr. 703-15 (Dr. Stevens' treatment notes from late 2014 through much of 2015 reflect no complaints of side effects from Synthroid, including no reports of dizziness)). Even if such evidence existed, the ALJ's failure to include these limitations in his RFC assessment (and in the hypothetical question to the VE) is mere harmless error because, according to the Dictionary of Occupational Titles, all of Holcombe's prior relevant jobs, as well as the other medium jobs identified by the VE, involve either no exposure or only occasional exposure to hazardous machinery and no exposure to unprotected heights. *See* DOT § 222.387-026 (work as an inventory clerk requires no exposure to unprotected heights or moving mechanical parts); § 354.377-014 (work as a home attendant requires no exposure to unprotected heights or moving mechanical parts); § 786.685-030 (work as a sewing machine operator requires no exposure to unprotected heights and only occasional exposure to moving mechanical parts); § 317.687-010 (work as a cook helper requires

no exposure to unprotected heights or moving mechanical parts); § 806.684-010 (work as an assembler requires no exposure to unprotected heights or moving mechanical parts); & § 920.587-018 (work as a hand packager requires no exposure to unprotected heights or moving mechanical parts)). In other words, because Plaintiff cannot establish that the environmental limitations found by Dr. Kidd (that is, only occasional exposure to unprotected heights and moving mechanical parts) would preclude her performance of her past relevant work as an inventory clerk, home attendant or sewing machine operator, or the other medium work identified by the VE (hand packager, assembler, and cook helper), the ALJ's failure to include these limitations in his RFC assessment (and in the hypothetical question posed to the VE) was mere harmless error.

As for the ALJ's somewhat confusing analysis of Dr. Kidd's noted standing and walking limitations (*see* Tr. 280 ("[T]he standing and walking limitations cannot be viewed in th[e] light [most favorable to the claimant]. The form itself lends to some question regarding the interpretation of the claimant's ability to stand and/or walk. However, there is no indication that the form supports any limitation in standing and walking greater than six hours total in an eight-hour day. Dr. Kidd provided no indication that standing and walking is diminished by any physical impairment. He stated that the claimant can continuously push or pull with the lower extremities, and he stated that the claimant had no difficulty ambulating without a limp or squatting and standing. Dr. Kidd's form actually indicates that the claimant can stand/walk for eight hours total in an eight hour day. There is no support for even a required alternation among sitting and standing in the examination report or in the other evidence prior to that time.")), while the undersigned agrees with Plaintiff that the ALJ did not "attempt to discredit in any

manner the opinions of Dr. Kidd regarding [her] limitations in standing and walking[]"

(Doc. 14, at 14), this Court cannot agree with Plaintiff that the standing and walking

limitations noted by Dr. Kidd (4 hours of standing in an 8-hour workday and 4 hours of

walking in an 8-hour workday) "is inconsistent with the definition of the full range of

medium work, which requires the ability to walk for six (6) hours." (Doc. 14, at 14.) The

undersigned disagrees with the Plaintiff's position in this regard because Dr. Kidd's PCE

form can be read in no other manner than as establishing that Holcombe, in an 8-hour

workday, can stand and/or walk a total of 8 hours, as the ALJ ultimately indicated (Tr.

280; *see also* Tr. 279 ("[Dr. Kidd] stated that the claimant could stand/walk eight hours

in an eight-hour day.")), *cf. Sanchez v. Commissioner of Social Security,* 2013 WL

178241, *10 (M.D. Fla. Jan. 2, 2013) (court offering practical sense guidance on how to

read a physician's PCE, noting that physician's opinion that the claimant "is only

capable of standing for two hours and walking for two hours in an 8-hour workday[]"

means that the doctor "opined that Claimant can only stand and walk for a total of 4 out

of 8 hours in a workday."), *report and recommendation adopted,* 2013 WL 178212 (M.D.

Fla. Jan. 17, 2013), Plaintiff's arguments to the contrary (Doc. 14, at 14-15)

notwithstanding. And, of course, the ability to stand and/or walk a total of 8 hours out of

an 8-hour workday would be inherently consistent with the definition of medium work set

forth in SSR 83-10, which requires the ability to stand or walk, "off and on," for

approximately 6 hours in an 8-hour workday. *See id.*[8] Therefore, the ALJ's RFC

---

[8]     In addition, application of SSR 83-10 seems be somewhat "up in the air" in light
of the unpublished Eleventh Circuit panel decision in *Freeman v. Commissioner, Social Security
Admin.*, 593 Fed.Appx. 911 (11th Cir. Nov. 25, 2014), that "[t]he definition of medium work []
does not include any standing or walking limitations, and only requires the lifting of up to 50
pounds[.]"     *Id.* at 915. And since Dr. Kidd certainly indicated (on January 10, 2013) that
(Continued)

assessment is in no manner undercut by "the plain reading of Dr. Kidd's report[]" (Doc. 14, at 15); instead, the hearing officer's RFC assessment is fully consistent with Dr. Kidd's report, save for noted environmental limitations that have been shown to have no fourth and fifth step consequences.

Turning to Dr. Dempsey's February 18, 2016 consultative opinion, which indicated significant physical limitations (Tr. 725-31 (indicating Holcombe can continuously lift and carry up to 20 pounds, can only stand and walk one hour each out of an 8-hour workday, can never climb stairs, ramps, ladders or scaffolds, and can never stoop, kneel, crouch or crawl); *see also id.* at 724 ("Traveling, standing, walking, lifting and carrying objects are not compatible with her orthopedic problems.")), the ALJ set forth the following reasons for rejecting these particular opinions:

> Dr. Dempsey actually suggests that the claimant would be capable of sedentary work; however, these limitations are not consistent with the evidence at the time of the date last insured, four years earlier. Even the year before, the claimant had "mild diffuse tenderness of lumbar area of back. No abnormality of exam of the right hip." In addition, there was only pain noted "on rotation of left hip." The claimant had "no motor or sensory deficit in either lower extremity." Likewise, on Dr. Dempsey's form, he noted that the claimant could push or pull continuously with the lower extremities. He stated that the claimant could ambulate without a walker, wheelchair, or two crutches" even at that time. The form he completed cannot be provided any significant weight.
>
> Likewise, there can be no significant weight provided to any opinion provided by Dr. Dempsey or even the treating sources briefly before or after that claimant's surgery for the hip replacement. The remarks pertaining to weight bearing or other related factors during the recuperative period for the claimant are not consistent with the evidence years prior to this treatment at the claimant's date last insured.

---

Holcombe had the ability to lift and carry up to 50 pounds (Tr. 252), it would appear that *Freeman* dictates the conclusion that any attempted reliance by Plaintiff on SSR 83-10 to prove that she is incapable of performing medium work "is misplaced." 593 Fed.Appx. at 915.

(Tr. 280.)

This Court can simply find nothing objectionable about the ALJ's overarching determination that the limitations noted by Dr. Dempsey are inconsistent with the evidence "at the time of the date last insured[]" or perhaps even from the year before. (*See id.*) In other words, the ALJ did not err in according no weight to the limitations noted by Dr. Dempsey in February of 2016 because those limitations are not bolstered by the evidence of record and, indeed, the evidence of record supports a contrary finding regarding Plaintiff's limitations as of the date last insured. *Cf., e.g., Gilabert v. Commissioner of Social Sec.*, 396 Fed.Appx. 652, 655 (11th Cir. Sept. 21, 2010) ("Good cause [for failing to accord the opinion of a treating physician substantial or considerable weight] is shown when the: '(1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records.'" (quoting *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004)). Given the degenerative nature of all of Plaintiff's physical impairments, it is clear that Holcombe's physical condition deteriorated over time to the point that when she saw Dr. Dempsey in February of 2016 she may have been capable of performing only sedentary work (*see* Tr. 721-31); however, nothing about the evidence of record before that time serves to "tie" Dempsey's limitations to the date last insured of December 31, 2011 or to a period before the second half of 2015. The records from Holcombe's treating physician, Dr. Norman Stevens, III, from 2008 through most of 2012 reflect few orthopedic complaints, none of which centered on Plaintiff's right hip and low back. (*See generally* Tr. 197-232 & 236-44; Tr. 203 (on March 21, 2011, musculoskeletal examination revealed normal

strength and tone, no swelling, and full range of motion; Holcombe's station and gait were normal, with smooth movement and no pelvic tilt); Tr. 209 (tenderness and swelling was noted with respect to Plaintiff's left ankle in April of 2009); Tr. 237 (on April 17, 2012, there were no musculoskeletal complaints and physical examination revealed a normal well-developed Plaintiff in no acute distress, with no leg edema); Tr. 241 (on February 28, 2012, Plaintiff complained of left wrist and forearm pain)).[9] In particular, the record does not contain any mention of back and hip pain until August 28, 2012 (Tr. 246-47), almost eight months after the date last insured of December 31, 2011. And even after this date, in January 2013, the consultative examination by Dr. Kidd reflects no significant clinical findings (*see* Tr. 251 ("[S]he has full range of motion and 5/5 strength of bilateral upper extremities, full range of motion and 5/5 strength [of] bilateral lower extremities. She is able to heel walk, toe walk, bend and touch her toes and squat and stand without difficulty. She ambulates without a limp.")), though Plaintiff complained of pain in her back, hips, etc. (Tr. 250), and an opinion from the consultative examiner consistent with the ability to perform medium work activity (Tr. 252-57), *see Freeman, supra*. There is x-ray evidence from May 14, 2013 showing mild degenerative changes of both hip joints (Tr. 698), which appears to have worsened a bit by February 19, 2015 (Tr. 702 (bilateral hip x-ray revealed "[m]ild degenerative changes [] in both hip joints with superior joint space narrowing, eburnation, osteophyte formation and subchrondral cyst formation. Numerous phleboliths are seen in the pelvis. Bilateral sacroilitis is noted."); *see* Tr. 701 ("Five views of the lumbar spine are submitted. . . . The lumbar vertebral bodies are in good alignment except for grade I spondylolisthesis

---

[9]     The hearing transcript from January 7, 2016 makes clear that Plaintiff's claim for benefits "centered" on her chronic lower back and hip pain. (Tr. 299.)

at L4-5 without evidence of spondylolysis. Degenerative facet disease is seen in the lower lumbar spine. No acute fractures are identified. There is mild loss of disc height throughout the lumbar spine.")); however, what really begins to increase in 2015 (particularly the second half of 2015) are Plaintiff's visit to her treating physician, and other physicians, complaining of low back and right hip pain (Tr. 709-11 (on February 19, 2015, Plaintiff complained to her treating physician of pain in the low back and right hip; she was noted to be in no acute distress on examination, with only mild defuse tenderness of the lumbar area of the back and no abnormality in examination of the right hip); Tr. 733-35 (on July 27, 2015, Plaintiff complained of right hip pain to Dr. Stevens; there was mild diffuse tenderness of the right SI area of the back, with no abnormality in examination of the right hip and a negative straight leg raise test bilaterally); Tr. 736-38 (on October 20, 2015, Plaintiff complained of right hip pain radiating down the right leg; she was noted to be in no acute distress on examination, with only mild defuse tenderness of the lumbar area of the back and no abnormality in examination of the right hip); Tr. 716 (on October 27, 2015, Holcombe presented to Dr. Albert F. Haas, an orthopedist, reporting right hip and thigh pain of one-year duration that had gradually "gotten worse and worse" and "hurts mainly when ambulating[;]" physical examination revealed a "[r]obust female . . . in no distress[,]" with a slightly antalgic gait to the right,[10] marked pain on any rotation of the right hip and decreased range of motion on the right, slight right quad atrophy, and some hip abductor weakness with a lot of guarding); Tr. 717-19 (November 2, 2015 MRI of the right hip showed no

---

[10]    Antalgic means "counteracting or avoiding pain, as a posture or gait assumed so as to lessen pain." http://medical-dictionary.thefreedictionary.com/antalgic (last visited September 5, 2017, at 10:20 a.m.).

evidence of significant osteoarthritic change but findings suggestive of possible metastatic disease involving the bony pelvis; however, a bone scan performed on November 3, 2015 revealed findings merely suggestive of possible facet arthropathy of the mid to lower L-spine and possible changes of sacrolitis in the area of the right iliac bone near the SI joint); and Tr. 739-44 (Plaintiff presented to Dr. Stevens on November 12, 2015, and again on November 24, 2015, for further evaluation of her right hip/leg pain following Dr. Haas' workup; the treating physician offered no physical examination findings different from those previously noted)).

The foregoing medical evidence is that which sets the stage for Dr. Dempsey's examination of Holcombe on February 18, 2016. (*Compare id. with* Tr. 721-31.) And given Plaintiff's plausible report to Dempsey that her right hip pain had progressively worsened "over the last several years[]" (Tr. 721), along with clinical findings suggesting that her right hip pain was continuing to worsen (Tr. 723 ("she walks with an antalgic gait on the right side"); *compare id. with* Tr. 716 (examination by Dr. Haas on October 27, 2015 revealed only a slightly antalgic gait to the right)), there can be little question but that Plaintiff's physical condition/impairments—particularly with respect to her right hip and her low back—deteriorated over time such that Dr. Dempsey may well be right that as of February 18, 2016, Plaintiff was capable of performing only sedentary work; however, as reflected above, nothing about the objective findings of record prior to certainly mid-2015 are supportive of the narrative/PCE limitations noted by Dempsey on February 18, 2016. Indeed, the limitations found by Dempsey are unquestionably so much more severe than the limitations noted by Dr. Kidd on January 10, 2013, a little over a year after Plaintiff's date last insured, that the only plausible explanation is that

Plaintiff's physical condition deteriorated commensurate with her advancing age. Accordingly, the undersigned finds no error in the ALJ's refusal to accord weight to the limitations found by Dr. Dempsey on February 18, 2016[11] vis-à-vis Plaintiff's ability to perform work activity on her date last insured because, as reflected in Dr. Kidd's PCE, the dearth of objective medical findings of record between 2010 and mid-2015, and the description of Plaintiff's activities of daily living prior to the date last insured (*see* Tr. 277), Holcombe indisputably had the residual functional capacity to perform a limited range of medium work through the date last insured.[12]

There being no other claims of error asserted, the Court finds that the Commissioner's final decision denying Holcombe benefits is due to be affirmed.

---

[11]　　The Plaintiff appears to be suggesting that because the ALJ's findings of severe impairments as of the date last insured "mirror" Dr. Dempsey's diagnoses, his refusal to accord any weight to the limitations noted by Dr. Dempsey "is logically inconsistent and not supported by substantial evidence." (Doc. 14, at 16.) The undersigned, however, cannot agree with Plaintiff's argument in this regard not simply because the ALJ's severe impairment findings do not totally "mirror" Dempsey's diagnoses (*compare* Tr. 275 (ALJ found mild degenerative disc disease) *with* Tr. 723 (Dempsey diagnosed mild "cervical" degenerative disc disease)) but, more importantly, because Dr. Dempsey gave no indication on the PCE form that the limitations thereon arose from Plaintiff's diagnoses but, instead, linked those limitations to Plaintiff's hip and back pain (*see* Tr. 727 & 729-30), pain which is at the very "core" of Plaintiff's claim for benefits (*see* Tr. 299). And, as aforesaid, Plaintiff first reported hip and back pain beginning not later than August 28, 2012 (Tr. 246-47), four and one-half months after which Dr. Kidd specifically indicated that Holcombe was capable of performing medium work activity (*see* Tr. 252-57).

[12]　　Stated somewhat differently, the ALJ specifically linked his RFC determination (*see* Tr. 277 & 278-79) to specific evidence in the record bearing upon the claimant's ability to perform the physical and other requirements of work through the date last insured of December 31, 2011 (*compare id. with* Tr. 197-232, 236-44, 246-47, 250-57 & 698), such that his failure to afford any weight to the February 18, 2016 limitations imposed by Dr. Dempsey was not erroneous.

## **CONCLUSION**

It is **ORDERED** that the decision of the Commissioner of Social Security denying

Plaintiff benefits be affirmed.

**DONE** and **ORDERED** this the 11th day of September, 2017.

s/P. BRADLEY MURRAY
**UNITED STATES MAGISTRATE JUDGE**